IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRIE JENKINS, o/b/o,      *
KONNEISHA JENKINS,          *
                            *
    Plaintiff,             *
                            *
vs.                         *   Civil Action No. 03-00878-BH-B
                            *
JO ANNE B. BARNHART,        *
Commissioner of             *
Social Security,            *
                            *
    Defendant.             *

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C.§ 1383 (c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The parties waived oral argument.  Upon careful consideration of the administrative record and the parties' argument as raised in their memoranda, the undersigned respectfully recommends that the decision of the Commissioner be **affirmed.**

I.  **Procedural History**

Plaintiff's mother, Larrie Jenkins, filed on behalf of her daughter, Plaintiff Konneisha Jenkins, an application for supplemental security income benefits on April 16, 2001,

alleging that Plaintiff has been disabled since October 10, 1984, Plaintiff's birth date, due to anemia, a learning impairment, and skin problems. (Tr. 101-102, 136-146)[1]. Plaintiff's application was initially denied, and a Request for Hearing was filed on August 15, 2001. (Tr. 69-70, 81-83, 84).[2] Administrative Law Judge (ALJ) B. William Lawson conducted a hearing on August 23, 2002, which was attended by Plaintiff, her mother, Larrie Jenkins, and Plaintiff's attorney. (Tr. 36-61). On September 6, 2002, ALJ Lawson entered an unfavorable decision wherein he found that Plaintiff has the severe impairments of anemia, eczema, borderline intellectual functioning, Menometrorrhagia[3], and scoliosis, and that her impairments, when considered individually, or in combination, do not meet or medically equal a Listing, or functionally equal in severity an impairment set forth in the Listing of Impairments. (Tr. 20-34). Plaintiff's request for review was denied by the Appeals Council, thus making the ALJ's decision the final decision of

---

[1]  Plaintiff filed prior applications for supplemental security income benefits, which were denied, and are not before the Court. (Tr. 62-63, 64-66, 67-68, 92, 93-95, 97-100).

[2]  The reconsideration stage was eliminated from this case pursuant to testing modifications to the disability determination procedures. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

[3]  A condition characterized by prolonged bleeding that occurs at irregular intervals. *The Merck Manual - Second Home Edition,* http://www.merckhomeedition.com/home.html.

the Commissioner of Social Security. (Tr. 6-9, 10-13).   The parties agree that this case is now ripe for review and is properly before this Court pursuant to 42 U.S.C. § 1383 (c)(3).

## II.  Background Facts

Plaintiff, Konneisha Jenkins, who resides with her mother and four siblings, was born on October 10, 1984 and was seventeen years old at the time of the administrative hearing on August 23, 2002. (Tr. 40, 43).   At the hearing, Plaintiff's mother, Larrie Jenkins, testified that Plaintiff was in the tenth grade and attended regular classes.   According to Plaintiff's mother, Plaintiff had to repeat the fifth and seventh grade although no one had ever talked to her about placing Plaintiff in special education classes.   (Tr. 40-41, 43).   Plaintiff's mother also testified that Plaintiff does not take physical education (PE) class, regular or otherwise, at school. (Tr. 43).

According to Plaintiff's mother, Plaintiff suffers from skin problems, for which she applies cream daily that does not work. (Tr. 41, 47).   Plaintiff's mother testified that Plaintiff is supposed to apply cream to her skin three times a day, but Plaintiff applies it more frequently because it does not provide relief, and that Plaintiff's doctors have advised her that she will have skin problems for the rest of her life as there is

3

nothing that can be done to ease the problem.  (Tr. 42).

Plaintiff's mother also testified that Plaintiff suffers from, and takes medication for, severe anemia, and that due to her condition, Plaintiff gets dizzy all the time because she does not have enough blood.  (Tr. 42, 46, 48).  In addition, Plaintiff's mother testified that Plaintiff has irregular menstrual cycles and bleeds a lot. (Tr. 43-44).  Plaintiff's mother further testified that Plaintiff almost died twice; once in 1996 or 1997 when her appendix burst, and a second time a year or two before the administrative hearing when Plaintiff lost a lot of blood and had to be given a blood transfusion because she did not have enough blood to pump her heart.  (Tr. 44-45).

Plaintiff's mother further testified that Plaintiff was recently diagnosed with scoliosis, that she was unaware of Plaintiff's condition until 2002, and that Plaintiff's doctor have advised that Plaintiff should take medication and that she may need surgery if her back continues to hurt.  According to Plaintiff's mother, as a result of her scoliosis, Plaintiff's back is crooked and she limps when she walks.  (Tr. 46-47).  Plaintiff's mother also testified that Plaintiff takes Ibuprofen for her scoliosis and back pain.  (Tr. 48).

Plaintiff's mother testified that during the summer, when

4

Plaintiff is not in school, Plaintiff sits and lays around the house because she is tired. (Tr. 42). She further testified that Plaintiff sometimes watches televison a little, but not much, and that Plaintiff is unable to do any household chores, such as sweeping, mopping, cleaning, or washing dishes.[4] (Tr. 42-43, 48). Plaintiff's mother also testified that Plaintiff does not visit friends, nor do friends visit her. (Tr. 43). Plaintiff's mother further testified that Plaintiff does not get along with her siblings and prefers to be alone. (Tr. 48). Plaintiff's mother testified that Plaintiff has never taken a driver's license test, and although Plaintiff wants to drive, Plaintiff's mother is afraid to allow her because Plaintiff gets dizzy a lot and may blank out. (43, 47).

Plaintiff testified that she has experienced pain in her lower back since birth, but only recently learned that scoliosis is the cause of her pain. (Tr. 49-50). On a scale of one to ten, with ten being the worst degree of pain, Plaintiff testified that her pain was an eight all time. (Tr. 50). Plaintiff also testified that she has trouble bending over because it hurts her back. (Tr. 52). In addition, Plaintiff testified that she does not help with household chores because

---

[4] Plaintiff's mother testified that Plaintiff is allergic to the soap used to wash dishes, and breaks out if she washes dishes. (Tr. 43).

mopping and sweeping hurt her back, and she is unable to wash dishes because she is allergic to soap. Id. Plaintiff also testified that because of her back pain, she can only stand about 20 minutes before her back starts to hurt, and can only sit 30 minutes. (Tr. 54). Plaintiff further testified that she is only able to walk half a mile, that she is tired all the time, and has problems sleeping every night. (Tr. 53-55). Additionally, Plaintiff testified that her pain medication helps with her back pain; however, it does not help with her tiredness or sleeping problems. (Tr. 50, 54-55). With respect to her skin condition, Plaintiff testified that she experiences a great deal of itching on her arm, and although she applies cream all day, it does not help, and her doctors have said there is nothing else they can do. (Tr. 51). Plaintiff further testified that she experiences dizziness and has blacked out in the past, but she was unable to recall the last time she blacked. Id.

Plaintiff testified that she had to repeat the fifth and seventh grade, that she has problems with tests, and that her teachers sometime help her. (53). Plaintiff also testified that her ninth grade classes included Social Studies, English and Math and that she passed all of her classes. (Tr. 55-56). Plaintiff further testified that her courses for tenth grade include Social Studies, English, Reading, Algebra I and

6

Agricultural Science, and  that she does not participate in any school organizations, after school activities or clubs. (Tr. 56-58).

The ALJ determined that Plaintiff has not engaged in substantial gainful activity since her alleged onset of disability. (Tr. 24, 33).  The ALJ further determined that Plaintiff has the severe impairments of anemia, eczema, borderline intellectual functioning, Menometrorrhagia, and scoliosis.  (Tr. 30, 33).  Next, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments which meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, App. 1., Subpt. P.  (Tr. 30-31, 33).  The ALJ also found the allegations of Plaintiff and her mother regarding the severity and extent of Plaintiff's symptoms and limitations are not fully credible nor supported by objective medical evidence.  (Tr. 32-33).  The ALJ then determined that Plaintiff's impairments, when considered individually or in combination, are not functionally equivalent to a listed impairment, and that Plaintiff is therefore not disabled. (Tr. 31-33).

## III. <u>Issues on Appeal</u>

1.  Whether the ALJ erred by failing to find Plaintiff disabled under the medical equivalence standard relating to

7

Listings 112.05D and 8.05?

2.   Whether the ALJ erred by failing to find Plaintiff disabled under the functional equivalency standard relating to at least two out of the five functional domains?

## IV.  <u>Analysis</u>

### A.  <u>Standard of Review</u>

In reviewing claims brought under the Act, this court's role is a limited one.  The court's review is limited to determining: 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied.  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).[5]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983)(Substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").  In determining

_____

[5] This court's review of the Commissioner's application of legal principles is plenary.  <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. Lexis 10163 (S.D. Ala.).

**B.   <u>Discussion</u>**

The definition of "disabled" for children under 18 is:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i)(2004); <u>see</u> <u>also</u> 20 C.F.R. § 416.906 (2005). The Social Security regulations provide a three-step sequential evaluation process for determining childhood disability claims. <u>See</u> 20 C.F.R. § 416.924(a)(2005).[6]

---

[6] First, a determination must be made as to whether the claimant is engaging in substantial gainful activity. If so, a determination will be made that the claimant is not disabled and the claim will not be reviewed further. If it is determined that the claimant is not engaging in substantial gainful activity, next the claimant's physical or mental impairment(s) will be considered first to see if the claimant has an impairment or combination of impairments that is severe. If the claimant's impairment(s) is not severe, a determination will be made that the claimant is not disabled and the claim will not be reviewed further. Finally, if the claimant's impairment(s) is severe, the claim will be reviewed further to determine if the claimant has an impairment(s) that meets, medically equals, or functionally equals the listings. If the claimant has such an impairment(s), and it meets the duration requirement, the claimant will be found disabled. If the claimant does not

At step one, a plaintiff's age and work activity, if any, are identified.  At step two, the severity of the impairments is identified.  Under the regulations a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c)(2005).  If it is determined that a plaintiff has a severe impairment, at step three, the plaintiff must then establish that the impairment results in marked and severe functional limitations.  42 U.S.C. § 1382c(a)(3)(C)(i)(2004).  The regulations set forth that an "impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." 20 C.F.R. § 416.924(d) (2005).

In the case *sub judice*, the ALJ, in evaluating Plaintiff's child supplemental security income disability claim, found that Plaintiff has not engaged in substantial gainful activity since her alleged onset of disability, and that she suffers from the severe impairments of anemia, eczema, borderline intellectual

---

have such an impairment(s), or if it does not meet the duration requirement, the claimant will be found not disabled.  20 C.F.R. § 416.924(a)(2005); <u>see also</u> <u>Shinn v. Comm'r of Soc. Sec.</u>, 391 F.3d 1276, 1278-1279 (11th Cir. 2004).

functioning, Menometrorrhagia, and scoliosis. (Tr. 24, 30, 33). Then, as noted *supra*, proceeding to the next step, the ALJ found that these impairments, when considered individually, or in combination, do not meet or medically equal the criteria listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1. (Tr. 30-31, 33). The ALJ further determined that Plaintiff's impairments, when considered individually or in combination, are not functionally equivalent to a listed impairment, and that Plaintiff is therefore not disabled. (Tr. 31-33).

Plaintiff argues that the ALJ erred by failing to engage in any analysis of the evidence under the medical equivalence standard relating to Listings 112.05D and 8.05 in light of Plaintiff's combined additional impairments. To that end, Plaintiff argues that her combined impairments meet or medically equal Listings 112.05D and 8.05. Plaintiff avers that her IQ testing provides support for the first prong of Listing 112.05D, and evidence regarding Plaintiff's skin condition supports the level of severity required for the second prong. In addition, Plaintiff argues that she suffers from atopic dermatitis, rather than eczema as found by the ALJ, and that her condition is medically equal to Listing 8.05.

Listing 112.05 falls under 112.00 Mental Disorders of the Listings and provides:

11

> Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied. . .
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.05.

In the case *sub judice*, the ALJ found Plaintiff's IQ scores, which placed her within the mental retardation range, to be invalid. (Tr. 25, 28, 31). The record reflects that Plaintiff was evaluated and tested, at the request of the Agency, by Dr. Donald W. Blanton, Ph.D. in September 1998. Specifically, upon administration of the Wechsler Intelligence Scale for Children - III (WISC-III), on September 21, 1998, Plaintiff obtained a Verbal IQ score of 57, Performance IQ score of 57, and a Full Scale IQ score of 55, which placed Plaintiff in the moderate range of mental retardation. (Tr. 276). Dr. Blanton's examination of Plaintiff further revealed: normal thoughts and conversation; intact associations; affect was somewhat flattened but appropriate and not labile; no confusion; no anxiety and was not particularly restless, nor were any tremors noted; fair eye contact; mood mildly depressed and rare crying; poor sleep; fair appetite; weight stable; low energy; no

psychomotor retardation or agitation noted; no suicidal or homicidal ideation; no evidence of hallucinations, delusions, or persecutory fears; no phobias; compulsive about itching; alert; limited insight and poor judgement for age; no problems with hearing, vision or speech; normal gross and fine motor skills; and normal persistence and concentration. (Tr. 275-276). Dr. Blanton opined that Plaintiff's scores were fairly reasonable estimates of her level of intellectual functioning and concluded that Plaintiff suffered from anxiety/depression due to unknown skin disorder, moderate mental retardation, and a skin disorder. (Tr. 267-277).

Dr. Blanton conducted subsequent IQ testing of Plaintiff on January 31, 2002. (Tr. 28, 31, 358-361). Upon administration of the WISC-III, Plaintiff obtained a Verbal IQ score of 73, Performance IQ score of 69, and a Full Scale IQ score of 69, which placed Plaintiff at the top of the mild range of mental retardation. (Tr. 359). Dr. Blanton also administered the Wide-Range Achievement Test (Revised III), which resulted in Plaintiff achieving Reading scores on a 4th grade level, Spelling scores on a 5th grade level, and Arithmetic scores on a 3rd grade level. (Tr. 359-360). Based on Plaintiff's school problems, vocabulary and overall fund of knowledge, Dr. Blanton opined that Plaintiff's scores on the WAIS-III, placing her in the mild

range of mental retardation, were valid.  (Tr. 360).

Dr. Blanton's examination of Plaintiff revealed: normal thought and conversation; intact associations; affect was very flat but appropriate, not labile; no confusion; no anxiety, restlessness or tremors; fairly good eye contact; normal mood and rarely cries; good appetite; good sleep; weight stable; low energy level; no psychomotor retardation; no suicidal or homicidal ideation; no evidence of hallucinations, delusions, or persecutory fears; no phobias or obsessive compulsive traits; alert; limited insight; fair judgement for age; no problems with hearing, vision or speech; normal gross and fine motor skills; and good persistence and concentration.  (Tr. 358-359).

The record also reflects that Plaintiff was tested by consulting psychologist, Dr. Frank Biasco, who evaluated Plaintiff on November 17, 1998. (Tr. 25-26, 32, 279-280).  Dr. Biasco's examination of Plaintiff revealed: she was quiet, soft-spoken and rapport was never fully established; vision and hearing were within normal limits; she was able to follow simple directions; and minimum participation was noted.  Dr. Biasco observed:

> [Plaintiff] was very quiet and at times I felt she was malingering to a degree and was just erratic in her responses to questions and answers.  I do not feel that this is a valid estimate of intelligence but this was about the extent of her participation on this date, which was a mixture of some malingering and some

14

just educational retardation. Konneisha's span of
attention was very short and yet there were no obvious
behaviors associated with a learning disability.

(Tr. 279). Although when administered the Stanford-Binet, Form
L-M, Plaintiff's IQ score computed to 69, which placed her in
the educable mentally retarded range of intelligence, Dr. Biasco
opined that Plaintiff "is capable of functioning higher and . .
. at times . . . was not putting forth her best effort. There
was a hint or indication of malingering." (Tr. 279-280).

Plaintiff was also evaluated by consulting psychologist, Dr.
Nina E. Tocci, Ph.D., who opined that Plaintiff is likely
functioning within the low range to borderline range of
intellectual ability. (Tr. 27, 32, 344-346). Dr. Tocci's
examination of Plaintiff revealed that she: was oriented to time
person and place; demonstrated normal attention and
concentration; demonstrated fleeting eye contact, depressed
facial expressions and a passive attitude toward the examiner;
had appropriate affect and her mood was euthymic; demonstrated
normal flow of speech, thought content appropriate to mood and
circumstance, and a goal-directed thought organization; denied
experiencing suicidal or homicidal ideations, crying spells, or
appetite disturbance; and demonstrated some insight into her
behavior. (Tr. 345). Upon administration of the WAIS-III,
Plaintiff scored a Verbal Scale IQ score of 72, a Performance

Scale IQ score of 76, and Full Scale IQ score of 72, which placed Plaintiff in the borderline range of intellectual functioning.  Id.  Dr. Tocci reported that Plaintiff demonstrated poor effort and was unmotivated during the interview and testing and as a result, Dr. Tocci deemed the test results "invalid secondary to limited effort." (Tr. 346).  She further reported that:

> Mrs. Jenkins over dramatized and exaggerated the severity of Konneisha's concerns.  She reported that Konneisha's skin disorder is responsible for her failing grades and poor attention during class but she could not indicate the progress of treatment.

(Tr. 346).

In considering Plaintiff's mental abilities, the ALJ afforded little weight to the opinions and findings espoused by Dr. Blanton, upon which Plaintiff relies heavily in support of her arguments.  In discrediting Dr. Blanton's assessment of Plaintiff's mental abilities and IQ testing, citing 20 C.F.R. Pt 404, Subpt. P, App. 1, the ALJ found the testing performed by Dr. Blanton in 1998 was not current as Plaintiff was thirteen at the time and her IQ score was 57.  (Tr. 25, 31, 275-277).  The ALJ also found that Dr. Blanton's diagnosis of moderate mental retardation inconsistent with reports obtained from Plaintiff's school teachers in 1998. (Tr. 29, 31, 216-218, 219-221, 222-224).  Specifically, Plaintiff's sixth grade teacher and two of

16

her seventh grade teachers reported that Plaintiff: was in regular classes; performed average academically compared to other normal children; had no problems with absenteeism; interacted with and responded to teachers in a normal, age-appropriate manner; understood and followed instructions in a normal manner; had normal social skills; had no problems with self-help skills; exhibited strengths and weaknesses typical of normal children; had no physical problems; required no special devices; and exhibited no worsening in functioning or behavior or pattern of sudden changes in behavior.  Id.

Additionally, the ALJ observed that Dr. Blanton's January 2002 testing of Plaintiff revealed results which were inconsistent with the scores Plaintiff obtained in 1998. Although Dr. Blanton's subsequent testing revealed higher IQ scores for Plaintiff, the ALJ also found the 2002 assessments unreliable.  The ALJ observed that while Dr. Blanton reported that Plaintiff had problems at school, as noted *supra*, prior teachers described Plaintiff as functioning normal with no problems.  (Tr. 29, 31, 216-218, 219-221, 222-224).  The ALJ also observed that Plaintiff was in regular classes, had taken classes such as Algebra, Biology, and World History in regular classrooms, and had not been referred for special education classes or received any special counseling or tutoring.  (Tr.

17

29-30, 32, 143-144, 148, 156, 239-240). The ALJ also considered Plaintiff's Stanford Achievement scores and found them to be inconsistent with a finding of mental retardation. (Tr. 32, 225, 243). The ALJ also considered the opinions of Dr. Biasco and Dr. Tocci, both of whom opined that Plaintiff was functioning at a higher level than that reflected in her IQ scores, that Plaintiff did not give her full effort during the examinations, that Plaintiff was suspected of malingering to some extent, and that Plaintiff's scores were not a valid estimate of her intelligence (Tr. 279-280, 344-346).

The undersigned finds that substantial evidence supports the AJL's finding that Plaintiff did not meet the listing for mental retardation. Notwithstanding Plaintiff's arguments to the contrary, the undersigned finds that the ALJ set forth adequate reasons for the weight afforded the opinions and findings of Dr. Blanton, and clearly set forth record evidence upon which his decision was based. Indeed, as noted *supra*, both Dr. Biasco and Dr. Tucci opined that Plaintiff was malingering and that she is capable of functioning at a higher level than indicated by her IQ scores. Moreover, Plaintiff's school records and reports from her teachers provide further support for the ALJ's findings. Plaintiff's sixth and seventh grade teachers reported that she was in regular classes and that her academic

18

performance was average in comparison to other normal children. They also reported that Plaintiff interacted and responded to her teachers in an appropriate manner, and that she understood and follows instructions in a normal manner.  Additionally, Plaintiff's high school transcript reflects that she was taking subjects such as regular Algebra, Biology and World History, and that she was passing, or close to passing all of her subjects.

Moreover, in a Function Report completed on December 8, 2000, Plaintiff's mother reported that Plaintiff does not have any limitations in her ability to: understand and use what she has learned; engage in social activities or behavior with other people; and overall take care of her personal needs and safety. Although Plaintiff's mother reported that Plaintiff is limited in her ability to pay attention and stick with a task, she did not attribute it to Plaintiff's alleged learning impairment, but to the fact that she itches all the time.  (Tr. 163, 167-170).

In addition, in a questionnaire dated May 1, 2001, Plaintiff's mother reported that Plaintiff: cares for her personal needs without assistance; does her homework; watches television; and reads books for about a hour, three nights a week.  Although Plaintiff's mother reported that Plaintiff has problems doing her homework and work at school, she once again did not attribute it to Plaintiff's alleged learning impairment,

19

but to the fact that she itches.   (Tr. 207-208, 210-211). Further, Plaintiff's mother reported to Dr. Tocci that Plaintiff had to repeat two grades because of her skin condition and absences related to the same, rather than because of a learning impairment.   (Tr. 344-345).   In light of the above, the undersigned concludes that substantial record evidence supports the ALJ's finding that Plaintiff does not meet the first prong of Listing 112.05D because she does not have a valid IQ score. In the absence of a valid IQ score, the ALJ did not need to reach the second prong of 112.05D and determine if "a physical or other mental impairment posed an additional and significant limitation of function."

Additionally, while Plaintiff argues that the ALJ erred in not finding that she meets Listing 8.05, the undersigned disagrees.   Listing 8.05 falls under 8.00 of the Listings for skin disorders and provides:

> Psoriasis, atopic dermatitis, dyshidrosis. With extensive lesions, including involvement of the hands or feet which impose a marked limitation of function and which are not responding to prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 8.05

The record reflects that Plaintiff was treated at the Marengo Family Health Center during 1996 through 1998 on approximately six occasions for skin rashes, which were diagnosed as "chronic eczema" and "chronic atopic dermatitis".

20

(Tr. 267-274).  During Plaintiff's various visits, the rashes were observed on her arms, legs, neck, and chin, and were described as "dry scaly rash", "dry grey patchy appearance" and "grey scaly rash".  Although Plaintiff was prescribed various creams and lotions, the Marengo records do not reflect that the skin rashes imposed any functional limitations upon Plaintiff.

Upon examination of Plaintiff on September 9, 1998, consulting physician Dr. Warren Douglas Everett, M.D., opined that Plaintiff suffers from chronic eczema and poor performance in school, and reported that Plaintiff's skin condition "admittedly does not keep her from school or doing housework or prevent her from doing any activities". (Tr. 278).[7]  With regard to Plaintiff's skin problem, Dr. Everett prescribed a cream and opined that "[Plaintiff's] skin rash is not severe enough to be called disabling".  Id.  Additionally, upon examination of Plaintiff on May 9, 2001, consulting physician, Dr. Dee Dee Kidd, D.O., observed that Plaintiff had a full range of motion in her extremities, and that "[t]here are some darkened areas from previous skin lesions.  There is a small amount of erythema on the inside of her arms, mostly just hyperigmentation.  There

---

[7]  Like Dr. Everett, upon review of record evidence, non-examining State physicians also opined that Plaintiff suffered from chronic eczema, and that her condition, while severe, does not meet, medically equal, or result in severity equivalent to a listed impairment.  (Tr. 26, 281-288, 289-292, 349-356).

is no breakdown of the skin at this time." (Tr. 348). Dr. Kidd diagnosed Plaintiff's skin condition as eczema, and opined that she saw no reason Plaintiff would not be capable of going to work or school. (Tr. 347-348).

Based upon the above-referenced evidence, the undersigned concludes substantial record evidence supports the ALJ's finding that Plaintiff's skin condition does not meet or medically equal a listed impairment, including Listing 8.05[8]. Also, Plaintiff has failed to proffer any evidence that her skin condition imposed any marked limitations of functions. While Plaintiff's mother reported that Plaintiff's skin condition affected her concentration and caused her to miss school, her assertions are simply not borne out by the record evidence. In fact, Dr. Tocci opined that Plaintiff's mother "over dramatized and exaggerated" the severity of Plaintiff's condition. (Tr. 346). Moreover, Drs. Everett and Kidd opined that Plaintiff's skin condition was not severe enough to be disabling and does not prevent her from going to school or work. (Tr. 278, 347-348). Further, Plaintiff's school records do not reflect a history of excessive

---

[8]While Plaintiff asserts that the ALJ failed to conduct a proper analysis because he did not expressly reference Listing 8.05, the ALJ's extensive discussion of the medical records, testimony and other record evidence, including that pertaining to Plaintiff's skin condition, coupled with his statement that Plaintiff does not have an impairment, singularly or in combination that meets or medically equals in severity one set forth in the Listing of Impairments clearly demonstrates that he conducted a proper analysis even if he did not expressly reference Listing 8.05. (Tr. 23-34).

absences. (Tr. 239-240, 241-242). Accordingly, the undersigned finds that substantial record evidence supports the ALJ's finding that Plaintiff does not have an impairment, singularly or in combination, that meets or medically equals in severity one set forth in the Listing of Impairments.

Where, as in this case, a plaintiff's impairment do not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations which functionally equal the criteria for a listing. 20 C.F.R. §416.926a(a)(2005) ("If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings. By 'functionally equal the listings,' we mean that your impairment(s) must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain, as explained in this section.").

To make this determination, the Commissioner must address six domains of development or functioning: (i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health

and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i-vi)(2005). If a plaintiff has an extreme limitation in one domain or marked limitation in two domains, a finding of functional equivalence will be made. 20 C.F.R. § 416.926a(d),(e),(f) (2005).[9]

An extreme limitation of function occurs when the impairment "interferes very seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(3)(i)(2005). A marked limitation of function occurs when the impairment "interferes seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(2)(i)(2005). This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities. Id.

In the case *sub judice*, the ALJ, in determining that Plaintiff's impairments are not functionally equivalent to a listed impairment, found that Plaintiff has no functional limitations in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, and caring for self; and less than marked functional limitations in the domains of interacting and relating with

---

[9] The regulation sets forth the methods for using each domain to evaluate functional equivalence to a listing. 20 C.F.R. § 416.926a(f)(2005).

others and health and physical well-being.  (Tr. 31-33).  As the
ALJ did not find marked limitations in at least two domains of
functioning, or extreme limitations in at least one domain of
functioning, he determined that Plaintiff's impairments are not
functionally equivalent to a listed impairment, and therefore,
Plaintiff is not disabled.

> In reaching his decision, the ALJ explained:

> In determining severity and degree of limitation, I
> have considered multiple factors, including, but not
> limited to, the combined affects of multiple
> impairments; the child's ability to initiate, sustain
> and complete activities independently; the need for
> extra help, adaptions or structured/supportive
> settings; functioning in unusual versus routine
> setting; the use of early intervention and school
> programs; the impact of chronic illness; and effects
> of treatment.

(Tr. 24).  In her brief, Plaintiff appears to argue that the ALJ
erred in not finding a marked limitation in the areas of motor
activity, interacting with others and health and physical well
being.  According to Plaintiff, the ALJ should have utilized a
medical expert to determine the appropriate level of limitations
given Plaintiff's physical and mental impairments.  Based on a
review of the record, the undersigned finds that the ALJ did not
err in concluding that Plaintiff does not have marked or extreme
limitations in any of the domains.

As a threshold matter, the undersigned notes that the record
contains substantial medical evidence to support the ALJ's

findings.  As noted *supra*, while Plaintiff was treated at the Marengo Family Health Center during 1996 through 1998 for skin rashes, which were diagnosed as "chronic eczema" and "chronic atopic dermatitis", the records do not reflect that Plaintiff's skin condition imposed any functional limitations upon her. (Tr. 267-274). Moreover, Plaintiff underwent a consultative physical examination by Dr. Kidd in May 2001, and the examination revealed that Plaintiff had a full range of motion of her extremities, cranial nerves two through twelve were intact, and Plaintiff was able to squat and heal and toe walk without any problems. (Tr. 347-348).  Additionally, Dr. Blanton noted in his September 1998 and January 2002 evaluation that Plaintiff's "[g]ross and fine motor skills appeared within normal limits" (Tr. 276, 359).  Moreover, the record is completely devoid of any physical restrictions that have been placed upon Plaintiff by any doctors, including those who have treated her for her skin disease and scoliosis.  Additionally, while Plaintiff and her mother reported that Plaintiff is unable to participate in physical education, Plaintiff's school records reflect that she is actually enrolled in the class, and progressing satisfactorily.  In light of this substantial evidence, the undersigned finds that the ALJ did not err in concluding that Plaintiff had no limitations in the domain of

motor activity.

Likewise, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff had a less than marked limitation in the area of interacting and relating to others. While Plaintiff's mother reported that Plaintiff "fusses and fights a lot with her siblings", Plaintiff reported to Dr. Tocci that she relates poorly to two of her siblings; however, she gets along with her other siblings and her mother. (Tr. 344). Additionally, Plaintiff reported to Dr. Blanton in 1998 and 2002, that she has a lot of friends. (Tr. 276, 359). Indeed, at the administrative hearing, Plaintiff testified that she had recently returned to school from summer break, and that she had an opportunity to see some of her friends that she had not seen during the summer. (Tr. 57). Moreover, while Plaintiff and her mother reported that Plaintiff has been suspended from school one or two times, there is nothing in her school records that indicates that Plaintiff has problems with her peers or her teachers. Plaintiff's sixth and seventh grade teachers reported that her social skills were normal, and that she was able to interact and respond to teachers in a normal manner. (Tr. 216-218, 219-221, 222-224). In view of this substantial evidence, the ALJ did not err in finding that Plaintiff had a less than marked limitation in this domain.

There is also substantial evidence supporting the ALJ's finding that Plaintiff had less than a marked degree of limitation in the area of health and physical well being.  As noted *supra*, the ALJ determined that Plaintiff has the severe impairments of anemia, eczema, borderline intellectual functioning, menometrorrhagia and scoliosis.  (Tr. 30).  While the record reflects that Plaintiff was treated for anemia in March 2002, and has been treated for skin problems since 1996, the record is devoid of any evidence that suggests that any doctor has placed restrictions on Plaintiff's activities as a result.  In 2001, Dr. Kidd concluded that while it is unclear what caused Plaintiff's bleeding and resulting anemic condition, "as long as her blood count stayed up", Plaintiff would be capable of going to school and working. (Tr. 348).  Further, treatment notes from Dr. Travis dated September 2001 indicate that Plaintiff's hematocrit and hemoglobin were within the normal ranges. (Tr. 365).  Based on the record before this Court, the undersigned finds that the ALJ did not err in finding that Plaintiff did not have any marked limitations in the domain of health and physical well being, or any of the other five domains.

**V.   Conclusion**

For the reasons set forth, and upon careful consideration of

the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income benefits be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and recommendation.</u>

**DONE** this **29th** day of **March, 2005**.

<u>s/ SONJA F. BIVINS</u>
UNITED STATES MAGISTRATE JUDGE

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.   <u>**Objection**</u>.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   <u>**Opposing party's response to the objection.**</u>  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                              s / SONJA F. BIVINS
                        UNITED STATES MAGISTRATE JUDGE